193 P.3d 128 (2008)
Certification from the United States District Court for the Western District of Washington in Ramona DANNY, Plaintiff,
v.
LAIDLAW TRANSIT SERVICES, INC., Defendant.
No. 78421-3.
Supreme Court of Washington, En Banc.
Argued September 14, 2006.
Decided October 3, 2008.
*130 Kathleen Phair Barnard, Schwerin Campbell Barnard & Iglitzin LLP, Seattle, WA, for Plaintiff.
Nicholas Michael Beermann, Attorney at Law, Nishi-Azabu, Minato-ku, Tokyo, for Defendant.
Richard D. Reed, Attorney at Law, Vashon, WA, Patricia Sue Rose, Attorney at Law, Seattle, WA, for Amicus Curiae on behalf of Washington Employment Lawyers Association.
Sean M. Phelan, Frank Freed Subit & Thomas, Seattle, WA, Grace S. Huang, WA State Coalition Against Dom Violence, Seattle, WA, for Amicus Curiae on behalf of Washington State Coalition Against Domestic Violence.
OWENS, J.
ś1 The United States District Court for the Western District of Washington (District Court) certified the following question to this court:
Has the State of Washington established a clear mandate of public policy prohibiting an employer from discharging an at-will employee because she experienced domestic violence and took leave from work to take actions to protect herself, her family, and to hold her abuser accountable?
Order at 1. We are unable to answer the question as written because parts of the original question would require us to make factual inquiries that the District Court itself must undertake. We choose to reformulate the question.[1] The reformulated question is: Has the State of Washington established a clear mandate of public policy of protecting domestic violence survivors and their families and holding their abusers accountable? We answer the question in the affirmative. This policy is manifested in numerous legislative, judicial, constitutional, and executive expressions of public policy.

FACTS
ś2 The District Court and the parties prepared a statement of facts to guide this court in reaching its decision. Order at 3-4. According to the statement of facts, defendant Laidlaw Transit Services, Inc. (Laidlaw) hired plaintiff Ramona Danny in February 1997. Laidlaw provides transit services in King County, Washington, working with big subcontractors on projects that provide public transit route bids to King County. In October 2002, Laidlaw promoted Danny to the position of scheduling manager.
ś3 While she was working at Laidlaw, Danny and her five children experienced ongoing domestic violence at the hands of her husband. She moved out of her house in February 2003 after suffering serious physical abuse but had to leave her children behind. In June 2003, she told Project Manager Jeff Kaeder about her domestic violence situation. In August 2003, Danny requested time off so she could move her children away from the abusive situation at their home. The project manager initially refused because Danny was working on a large project with an October deadline. The project was a route bid for Laidlaw's largest subcontractor; the route bid covered 3,000-4,500 of the call center rides each day, and it was Danny's job to put the route bid together. On August 20, 2003, Danny's husband beat her 13-year-old son so badly that he had to be hospitalized. Danny immediately moved all five children out of the home. When she returned to work, Danny again requested time off to move her children to a shelter. The project manager approved paid time off between August 25 and September 8, 2003. The record reveals that during late August and early September 2003, Danny conferred with police regarding protection from her husband and assisted in the prosecution against him for *131 the assault of her son. Danny Decl. at 1. During this time, Danny also used services from the King County Department of Community and Human Services to obtain transitional housing, domestic violence education, counseling and health services, and legal assistance. Id. at 2.
ś4 On October 9, 2003, about a month after returning to work, Laidlaw demoted Danny from manager and offered her the position of scheduler, which she accepted. Laidlaw terminated Danny's employment on December 3, 2003. Laidlaw's stated reason for termination was falsification of payroll records.
ś5 Danny filed her complaint against Laidlaw on May 10, 2005, alleging that Laidlaw terminated her employment in violation of public policy and Washington's Law Against Discrimination, chapter 49.60 RCW. On October 27, 2005, Laidlaw filed a motion for judgment on the pleadings seeking to dismiss Danny's public policy claim. The District Court stayed its decision on Laidlaw's motion and instead certified the above question to this court.

ANALYSIS
ś6 Wrongful Discharge in Violation of Public Policy. Absent a contract to the contrary, Washington employees are generally terminable "at will." Gardner v. Loomis Armored, Inc., 128 Wash.2d 931, 935, 913 P.2d 377 (1996). An at-will employee may quit or be fired for any reason. Id. The common law tort of wrongful discharge is a narrow exception to the terminable-at-will doctrine. Id. at 935-36, 913 P.2d 377. The tort of wrongful discharge applies when an employer terminates an employee for reasons that contravene a clearly mandated public policy. Id. As this court has previously stated, the tort of wrongful discharge "`operates to vindicate the public interest in prohibiting employers from acting in a manner contrary to fundamental public policy.'" Christensen v. Grant County Hosp. Dist. No. 1, 152 Wash.2d 299, 313, 96 P.3d 957 (2004) (emphasis omitted) (quoting Smith v. Bates Technical Coll., 139 Wash.2d 793, 801, 991 P.2d 1135 (2000)).
ś7 To sustain the tort of wrongful discharge in violation of public policy, Danny must establish (1) "the existence of a clear public policy (the clarity element);" (2) "that discouraging the conduct in which [she] engaged would jeopardize the public policy (the jeopardy element);" (3) "that the public-policy-linked conduct caused the dismissal (the causation element);" and (4) "[Laidlaw] must not be able to offer an overriding justification for the dismissal (the absence of justification element)." Gardner, 128 Wash.2d at 941, 913 P.2d 377. Whether Washington has established a clear mandate of public policy is a question of law subject to de novo review. Sedlacek v. Hillis, 145 Wash.2d 379, 388, 36 P.3d 1014 (2001); Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1, 149 Wash.2d 660, 670, 72 P.3d 151 (2003).
ś8 The reformulated certified question requires us to determine whether Danny has met the "clarity" element of wrongful discharge in violation of public policy. To determine whether a clear public policy exists, we must ask whether the policy is demonstrated in "`a constitutional, statutory, or regulatory provision or scheme.'" Thompson v. St. Regis Paper Co., 102 Wash.2d 219, 232, 685 P.2d 1081 (1984) (quoting Parnar v. Americana Hotels, Inc., 65 Haw. 370, 380, 652 P.2d 625 (1982)). Although judicial decisions may establish public policy, "`courts should proceed cautiously if called upon to declare public policy absent some prior legislative or judicial expression on the subject.'" Id. (emphasis omitted) (quoting Parnar, 65 Haw. at 380, 652 P.2d 625). To qualify as a public policy for purposes of the wrongful discharge tort, a policy must be "truly public" and sufficiently clear. Sedlacek, 145 Wash.2d at 389, 36 P.3d 1014; see also Dicomes v. State, 113 Wash.2d 612, 618, 782 P.2d 1002 (1989) ("`[P]ublic policy concerns what is right and just and what affects the citizens of the State collectively.'" (quoting Palmateer v. Int'l Harvester Co., 85 Ill.2d 124, 130, 421 N.E.2d 876, 52 Ill.Dec. 13 (1981))).
ś9 This court has always been mindful that the wrongful discharge tort is narrow and should be "applied cautiously." Sedlacek, 145 Wash.2d at 390, 36 P.3d 1014. *132 Washington courts have generally recognized the public policy exception when an employer terminates an employee as a result of his or her (1) refusal to commit an illegal act, (2) performance of a public duty or obligation, (3) exercise of a legal right or privilege, or (4) in retaliation for reporting employer misconduct. Gardner, 128 Wash.2d at 935-36, 913 P.2d 377.
ś10 Danny argues that she performed a public duty when she acted to protect herself and her children and that she exercised a legal right to obtain protection from her abuser. Danny points to several sources of this public policy from the legislative, executive, and judicial branches of government. We find a public policy of preventing domestic violence most clearly established in the State's legislative enactments. We also find the policy pronounced by executive and judicial sources.
ś11 Legislative Expression of Public Policy. As early as 1979, the legislature recognized that domestic violence is a community problem that accounts for a "significant percentage" of violent crimes in the nation and is disruptive to "personal and community life." RCW 70.123.010. At that time, the legislature declared "that there is a present and growing need to develop innovative strategies and services which will ameliorate and reduce the trauma of domestic violence." Id. To that end, the legislature created funding for domestic violence shelters, recognizing that many domestic violence victims are unable to leave violent situations without proper resources. Id. Also in 1979, the legislature enacted the domestic violence act (DVA), chapter 10.99 RCW, requiring law enforcement to respond to domestic violence. The legislature stressed "the importance of domestic violence as a serious crime against society and [sought] to assure the victim of domestic violence the maximum protection from abuse which the law and those who enforce the law can provide." RCW 10.99.010. The legislature later expanded the DVA to require the mandatory arrest of domestic violence perpetrators, RCW 10.99.030(6)(a), and has also expanded the definition of domestic violence to include violence between nonmarried individuals and individuals in "dating relationship[s]." LAWS of 1995, ch. 246, § 21(1). Most recently, "[t]he legislature reaffirm[ed] its determination to reduce the incident rate of domestic violence," and directed law enforcement organizations to develop policies "on domestic violence committed or allegedly committed by sworn employees of agencies." LAWS of 2004, ch. 18, § 1; RCW 10.99.090(1).
ś12 In 1984, soon after enacting the DVA, the legislature enacted a separate Domestic Violence Prevention Act (DVPA), chapter 26.50 RCW, to provide domestic violence victims with the ability to obtain a civil protection order against their abusers. RCW 26.50.030. The legislature recognized protection orders as "a valuable tool to increase safety for victims and to hold batterers accountable." LAWS of 1992, ch. 111, § 1. Significantly, it found that "Domestic violence costs millions of dollars each year in the state of Washington for health care, absence from work, services to children, and more. The crisis is growing." Id. (emphasis added) ("Domestic violence must be addressed more widely and more effectively in our state.").
ś13 The legislature has since amended the DVPA several times to improve the protection order process "so that victims have ... easy, quick, and effective access to the court system." Id. The legislature has eliminated the filing fee requirement to "increase victim's access to protection" and comply with the federal Violence Against Women Act (42 U.S.C. § 13701). S.B. REP. on S.B. 5219, at 4, 54th Leg., Reg. Sess. (Wash.1995). The legislature also amended the DVPA to give full faith and credit to out-of-state protection orders to remove "the barriers faced by persons entitled to protection." RCW 26.52.005.
ś14 In 1991, following enactment of the DVPA, the legislature created an address confidentiality program (ACP), chapter 40.24 RCW, to protect domestic violence victims "attempting to escape from actual or threatened domestic violence." RCW 40.24.010. The law provides domestic violence victims another layer of protection by allowing the secretary of state to provide victims with a substitute address in order to prevent abusers from locating their victim. Id. As one commentator has noted, the ACP "provides a *133 method to help victims of domestic violence avoid being tracked by their assailants, and thereby attempt a fresh start on their lives and those of their children." Jeffrey T. Even, Washington's Address Confidentiality Program: Relocation Assistance for Victims of Domestic Violence, 31 GONZ. L.REV. 523, 524 (1995/96). Indeed both the DVPA and the ACP provide important mechanisms that assist victims escaping domestic violence.
ś15 In recent years, the legislature has expanded domestic violence protection in Washington and highlighted the need for community involvement. In 2002, apparently recognizing that fear of losing employment may hinder escape from domestic violence, the legislature enacted laws allowing domestic violence victims to receive unemployment compensation through the state if they must leave employment to protect themselves or their immediate family from violence. RCW 50.20.050(1)(b)(iv).[2] The legislature further facilitated escape options for domestic violence victims in 2004, by allowing victims to terminate residential leases without penalty. LAWS of 2004, ch. 17, § 1; RCW 59.18.575,.580. This legislation further prohibits landlords from refusing to enter into a lease agreement based on an individual's status as a domestic violence victim. In enacting the law, the legislature explicitly recognized the difficulty victims face when leaving their abusers: "The legislature finds that the inability of victims to terminate their rental agreements hinders or prevents victims from being able to safely flee domestic violence, sexual assault, or stalking." Laws of 2004, ch. 17, § 1(1). The legislature clearly sought to remove barriers domestic violence victims face in order to be safe from harm: "The legislature further finds that victims of these crimes who do not have access to safe housing are more likely to remain in or return to abusive or dangerous situations.... The legislature further finds that evidence that a prospective tenant has been a victim of domestic violence ... is not relevant to the decision whether to rent to that prospective tenant." Id.
ś16 In 2005, the legislature took another step to encourage victims of domestic violence to escape and prevent further violence by creating a domestic violence prevention account in the state treasury and directing the Department of Social and Health Services to distribute funds to "preventive, nonshelter community-based services" for "victims of domestic violence ... and ... children who have witnessed domestic violence." RCW 70.123.150, .030(6). The legislature specifically intended to fund legal services for domestic violence victims who "have the highest need in terms of legal services," but "do not have access to legal services and do not know their rights under the law." H.B. REP. on H.B. 1314, at 3, 59th Leg., Reg. Sess. (Wash.2005).
ś17 In addition to facilitating domestic violence victims in their escape, the legislature has also emphasized the importance of prosecuting domestic violence perpetrators. The legislature has emphasized that crime victims have a "civic and moral duty" to "fully and voluntarily cooperate with law enforcement and prosecutorial agencies." RCW 7.69.010 (emphasis added). In 1996, the legislature recognized the difficulty domestic violence victims face when reporting abuse and declared it a gross misdemeanor for a domestic violence perpetrator to interfere in the victim's reporting of the abuse. RCW 9A.36.150. The legislature has also made violation of a protection order under the DVPA a crime. RCW 26.50.110. The legislature has treated domestic violence as a serious crime against society, imposed harsh penalties, and denied earned early release time for domestic violence offenders. RCW 9.94A.728. In an effort to prevent perpetrators from engaging in further violence, the legislature has created domestic violence treatment programs for abusers and provided *134 courts with the ability to order a perpetrator into treatment. RCW 26.50.150.
ś18 The legislature has been equally as adamant in demanding protection for child victims of family violence such as Danny's 13-year-old son: "[C]hild abuse and neglect is a threat to the family unit and imposes major expenses on society.... It is ... the intent of the legislature that prevention of child abuse and child neglect programs are partnerships between communities, citizens, and the state." RCW 43.121.010, .020 (establishing council for the prevention of child abuse and neglect); see also LAWS OF 1987, ch. 351, § 1 ("Child abuse and neglect prevention programs can be most effectively and economically administered through the use of trained volunteers and the cooperative efforts of the communities, citizens, and the state."); WASH. STATE GENDER & JUSTICE COMM'N, DOMESTIC VIOLENCE MANUAL FOR JUDGES 2-35 (rev. ed.2001) (noting the overlap between domestic violence and child abuse). The legislature has specifically recognized that children "are deeply affected by the violence" in their homes "and could be the next generation of batterers and victims." LAWS OF 1991, ch. 301, § 1. The legislature has also created procedures for obtaining a protective order against the abuser of a child. Significantly, the legislature has declared that individuals with the physical custody of a child "have an affirmative duty to assist in the enforcement of the restraining order." RCW 26.44.063(8) (emphasis added).
ś19 The legislature's consistent pronouncements over the last 30 years evince a clear public policy to prevent domestic violenceâ a policy the legislature has sought to further by taking clear, concrete actions to encourage domestic violence victims to end abuse, leave their abusers, protect their children, and cooperate with law enforcement and prosecution efforts to hold the abuser accountable. The legislature has created means for domestic violence victims to obtain civil and criminal protection from abuse, established shelters and funded social and legal services aimed at helping victims leave their abusers, established treatment programs for batterers, created an address confidentiality system to ensure the safety of victims, and guaranteed protection to victims exercising their duty to cooperate with law enforcement. The legislature's creation of means to prevent, escape, and end abuse is indicative of its overall policy of preventing domestic violence. This public policy is even more pronounced when a parent seeks, with the aid of law enforcement and child protective services, to protect his or her children from abuse.[3]
*135 ś20 The legislature's articulated policy is "truly public" in nature. Sedlacek, 145 Wash.2d at 389, 36 P.3d 1014. The legislature has repeatedly and unequivocally declared that domestic violence is an immense problem that impacts entire communities. E.g., LAWS OF 1992, ch. 111, § 1 (declaring that "[d]omestic violence is a problem of immense proportions affecting individuals as well as communities"); LAWS OF 2004, ch. 17, § 1(1) ("Domestic violence, sexual assault, and stalking are widespread societal problems that have devastating effects for individual victims, their children, and their communities."); RCW 10.99.010 (noting the "serious consequences of domestic violence to society and to the victims"); LAWS OF 1991, ch. 301, § 1 ("[T]he community has a vested interest in the methods used to stop and prevent future violence."); see also WASHINGTON STATE TASK FORCE ON GENDER AND JUSTICE IN THE COURTS, FINAL REPORT 18 (1989) (noting the idea that domestic violence is a "`family matter'" is a gender biased belief).[4]
ś21 Moreover, the legislature has specifically acknowledged that domestic violence negatively impacts victims and their employers. The legislature has declared "that domestic violence is the leading cause of injury among women" that often goes undiagnosed. RCW 43.70.610. The legislature has similarly recognized that domestic violence and its resulting trauma result in millions of dollars of costs in the form of "health care, absence from work, services to children, and more."[5] LAWS OF 1992, ch. 111, § 1 (emphasis added); accord LAWS OF 1991, ch. 301, § 1 ("The collective costs to the community for domestic violence include the systematic destruction of individuals and their families, lost lives, lost productivity, and increased health care." (emphasis added)). We find ample evidence of a clear public policy in the legislature's pervasive findings and enactments over the past 30 years.[6]
ś22 Executive's Expression of Public Policy. Washington State's public policy of preventing domestic violence is also expressed in Executive Order 96-05, issued by former Washington State Governor Mike Lowry in 1996. Wash. St. Reg. XX-XX-XXX (Nov. 6, 1996). Governor Lowry's executive order directs *136 each state agency to create workplace environments that provide "assistance for domestic violence victims without fear of reproach" (§ 1) and notes that domestic violence causes "loss of productivity, increased health care costs, increased absenteeism, and increased employee turnover." Id. The executive order further directs agencies to "assure[] that every reasonable effort will be made to adjust work schedules and/or grant accrued or unpaid leave to allow employees who are victims of domestic violence to obtain medical treatment, counseling, legal assistance, to leave the area, or to make other arrangements to create a safer situation for themselves." Id. § 3(d).
ś23 Laidlaw contends that the executive order is not a proper source of public policy because it is not a "`constitutional, statutory, or regulatory provision or scheme.'" Thompson, 102 Wash.2d at 232, 685 P.2d 1081 (quoting Parnar, 65 Haw. at 380, 652 P.2d 625). We disagree. This court has never characterized the list set forth in Thompson as exhaustive. On the contrary, we have recognized that while statutes and case law are "primary sources of Washington public policy," public policy may come from other sources. Sedlacek, 145 Wash.2d at 388, 36 P.3d 1014. We have previously found public policy in a federal statute, Thompson, 102 Wash.2d at 234, 685 P.2d 1081; a municipal fire code, Ellis v. City of Seattle, 142 Wash.2d 450, 466-67, 13 P.3d 1065 (2000); and in zoning and building codes, Hubbard v. Spokane County, 146 Wash.2d 699, 709, 50 P.3d 602 (2002). Other states have recognized that executive orders may form the basis of public policy. E.g., Kovalesky v. A.M.C Associated Merch. Corp., 551 F.Supp. 544, 548 n. 5 (S.D.N.Y.1982) (stating that termination must violate public policy expressed in laws, executive orders, regulations, or constitutions.); Hutson v. Analytic Scis. Corp., 860 F.Supp. 6, 12 (D.Mass.1994) (citing executive order as articulating public policy). The executive order is yet another expression of our state's public policy of preventing domestic violence by assisting victims of domestic violence to leave their abusers, protect themselves and children, and hold their abusers accountable through cooperation with police and prosecution.[7]
ś24 Constitutional Expression of Public Policy. This state's policy of preventing domestic violence also finds expression in Washington Constitution's crime victim amendment. Washington Constitution's crime victim amendment acknowledges that "Effective law enforcement depends on cooperation from victims of crime." WASH. CONST. art. I, § 35. This constitutional expression of public policy encourages crime victims like Danny to cooperate with law enforcement in order to hold their abusers accountable and thus prevent further violence.
ś25 Judicial Expression of Public Policy. The judicial expression of public policy is likewise pervasive. This court has specifically recognized a public policy interest in preventing domestic violence. State v. Dejarlais, 136 Wash.2d 939, 944-45, 969 P.2d 90 (1998) (finding a clear statement of public policy to prevent domestic violence and holding that reconciliation may not void a domestic violence protection order); In re Disciplinary Proceeding Against Turco, 137 Wash.2d 227, 253 n. 7, 970 P.2d 731 (1999) (holding that "[t]he Legislature has established a clear public policy with respect to the importance of societal sensitivity to domestic violence and its consequences"); see also State v. Dejarlais, 88 Wash.App. 297, 304, 944 P.2d 1110 (1997) ("The Legislature has clearly indicated that there is a public interest in domestic violence protection orders."), aff'd, 136 Wash.2d 939, 969 P.2d 90 (1998).
ś26 Likewise, our court has previously recognized, in dicta, a public policy of encouraging citizen cooperation with a police investigation when requested. Gardner, 128 Wash.2d at 942, 913 P.2d 377; see also Gaspar v. Peshastin Hi-Up Growers, 131 Wash. App. 630, 637, 128 P.3d 627 (2006) ("[R]ecognition of a public policy to assist law enforcement is fundamental."), review denied, 158 Wash.2d 1029, 152 P.3d 1033 (2007). The United States Supreme Court's recent holdings *137 limiting the use of testimonial hearsay evidence make a domestic violence victim's cooperation with law enforcement and prosecution efforts to hold an abuser accountable even more salient. See Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004); Davis v. Washington, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006); see also Tom Lininger, Prosecuting Batterers After Crawford, 91 Va. L.Rev. 747, 768 (2005) ("Crawford's impact has been particularly great on prosecutions of domestic violence, because these cases are more likely than others to rely on hearsay statements by accusers who may recant or refuse to cooperate with the prosecution at the time of trial."); Andrew King-Ries, Crawford v. Washington: The End of Victimless Prosecution?, 28 SEATTLE U.L.REV. 301, 301 (2005) ("Domestic violence offenses are difficult to prosecute because the batterer's actions often make the victim unavailable to testify."). A victim's participation in the investigation and prosecution of the abuser is now critical to successful prosecution.
ś27 Our court has also recognized a public policy of protecting human life from imminent harm. Gardner, 128 Wash.2d at 944, 913 P.2d 377. In Gardner, an employee left his armored truck against company policy to help a bank employee being chased by a man with a knife. This court held that "saving persons from life threatening situations" satisfied the clarity element. Id. at 945, 913 P.2d 377. Although the Gardner court recognized the policy in the context of imminent life threatening situations and the case alone does not establish the public policy that Danny seeks, its holding provides further evidence that this court has endorsed the protection of human life: "Society places the highest priority on the protection of human life." Id. at 944, 913 P.2d 377.
ś28 The Significance of Evidence of Public Policy. Laidlaw insists that any evidence of public policy is meaningless unless it directly addresses employers' responsibilities in preventing domestic violence. Resp't Br. at 16 ("[N]one of the statutes cited ... mandate a clear public policy in the employment arena."). The dissent and the concurrence/dissent agree with Laidlaw that a court may not find a clear mandate of public policy absent a legislative expression of public policy specific to the employment arena. Both opinions cite Thompson, our seminal wrongful discharge case, for the proposition that in order to demonstrate a clear public policy and satisfy the "clarity" element, the plaintiff must show that the employer contravened the public policy. This interpretation conflates the elements of wrongful discharge.
ś29 The "clarity" element does not require us to evaluate the employer's conduct at all; the element simply identifies the public policy at stake. Other elements of the tort serve to evaluate the employer's conduct in relation to that public policy. In Gardner, 12 years after Thompson, this court adopted the current four-part test for discharge in violation of public policy. Gardner, 128 Wash.2d at 941, 913 P.2d 377. The new test explicitly separated the requirement of a clear public policy (the "clarity" element) from the requirement that the employer's conduct threaten that policy (the "jeopardy" and "causation" elements). Id. at 941-42, 913 P.2d 377. The court specifically recognized that "[w]hereas prior decisions have lumped the clarity and jeopardy elements together, a more consistent analysis will be obtained by first asking if any public policy exists whatsoever, and then asking whether, on the facts of each particular case, the employee's discharge contravenes or jeopardizes that public policy." Id. at 941, 913 P.2d 377.
ś30 Because the "clarity" element does not concern itself with the employer's actions, the public policy need not specifically reference employment. In Thompson itself, the source of the public policyâ the Foreign Corrupt Practices Act of 1977â did not specifically address employment but rather prohibited bribery of foreign officials. 102 Wash.2d at 234, 685 P.2d 1081. In Ellis, we found that a municipal fire code established a public policy against unauthorized disabling of a fire system without requiring the fire code to reference employment. 142 Wash.2d at 461, 13 P.3d 1065. In Gardner, this court examined a situation in which an employer terminated an employee who violated company policy in order to save a human life. 128 Wash.2d at 933, 913 P.2d 377. We recognized *138 a clear public policy in support of preservation of human life without determining how such a duty might arise in the employment context. Id. at 944-45, 913 P.2d 377. In Gardner, we established that where a "fundamental public policy is clearly evidenced by countless statutes and judicial decisions," an employer may be liable for wrongful discharge if the employer fires an employee for taking actions necessary to protect that policy, regardless of whether the public policy itself addresses the employment context. Id.
ś31 The legislature's recent actions show that this state's clear and forceful public policy against domestic violence supports liability for employers who thwart their employees' efforts to protect themselves from domestic violence. The 2008 legislature unanimously passed Substitute House Bill 2602: "AN ACT Relating to increasing the safety and economic security of victims of domestic violence ..." SUBSTITUTE H.B. 2602, 60th Leg., Reg. Sess. (Wash. 2008). All 142 legislators who voted on the bill agreed that
[i]t is in the public interest to reduce domestic violence, sexual assault, and stalking by enabling victims to maintain the financial independence necessary to leave abusive situations, achieve safety, and minimize physical and emotional injuries, and to reduce the devastating economic consequences of domestic violence, sexual assault, and stalking to employers and employees.
LAWS OF 2008, ch. 286, § 1(1). To that end, the new law provides for "reasonable leave" for domestic violence victims to seek legal remedies, law enforcement assistance, treatment for injuries, services from shelters and other agencies, or to relocate themselves or their families, among other things. Laws of 2008, ch. 286, § 3. Though the legislature had not yet considered such a bill at the time of Danny's discharge, the fundamental public policy underlying the bill had long been established at that time.
ś32 The legislative, judicial, and executive branches of government have repeatedly declared that it is the public policy of this state to prevent domestic violence by encouraging domestic violence victims to escape violent situations, protect children from abuse, report domestic violence to law enforcement, and assist efforts to hold their abusers accountable. The public policy in this case overwhelmingly requires an affirmative answer to the certified question.
ś33 Limitations of this Holding. We are mindful of the employer's burden and the need to narrowly construe the public policy exception "in order to guard against frivolous lawsuits." Gardner, 128 Wash.2d at 936, 913 P.2d 377. In this case, we simply hold that Washington State has a clear public policy of protecting domestic violence survivors and their children and holding domestic violence perpetrators accountable.
ś34 Laidlaw argues that recognizing the clearly established public policy in this case will "require employers to serve as a functional equivalent of the Department of Social and Health Services." Resp't Br. at 11. Laidlaw also argues that "[a]n employee fearing discharge for what may be legitimate reasons need only claim to be a victim of domestic violence to be half way to a valid public policy claim when they are discharged." Id. at 39. Laidlaw's parade of horribles is unfounded. Our holding will in no way open the floodgates of litigation. The clarity element is merely one of the elements Danny and future plaintiffs must successfully establish in order to maintain a wrongful discharge claim. Plaintiffs like Danny must also satisfy the jeopardy, causation, and absence of justification elements of the wrongful discharge tort. Korslund v. DynCorp Tri-Cities Servs., Inc., 156 Wash.2d 168, 178, 125 P.3d 119 (2005).
ś35 We reformulated the original certified question precisely because it implicated other elements of the tort beyond the "clarity" element. The original certified question asked whether the employer in this case was prohibited from discharging the employee for taking time off work to protect herself from domestic violence. Such a question requires a factual inquiry that is properly before the trial court under the "jeopardy" element.
ś36 To satisfy the "jeopardy" element, the employee "must prove that discouraging *139 the conduct in which [she] engaged would jeopardize the public policy." Gardner, 128 Wash.2d at 941, 913 P.2d 377. This court was careful to note in Gardner that in order to satisfy the jeopardy element, the employee must show that her conduct "directly relates to the public policy, or was necessary for the effective enforcement of the public policy." Id. at 945, 913 P.2d 377. Accordingly, the employee must show that other means of promoting the policy are inadequate. Id.
ś37 The "jeopardy" element strictly limits the scope of claims under the tort of wrongful discharge. In this case, for example, in order for Danny to show that her conduct satisfies the "jeopardy" element, she will have to show that the time that she took off work was the only available adequate means[8] to prevent domestic violence against herself or her children or to hold her abuser accountable.[9] This inquiry will turn on the nature of the danger, the particular actions that Danny took, and the details of her work schedule. For example, if she wished to get a protection order, but the court was only open during her scheduled work hours, time off may have been necessary. The amount of time off would turn on her distance from the court and other relevant factual circumstances. On the other hand, if she worked at night, her employer would likely not have been obligated to give her any time off work to seek a protection order. Time off would only be required if she could not obtain the order outside of work hours. Likewise, if she were called to testify against her abuser, time off would have been necessary if the hearing were during her work hours. If she needed to move her family to a shelter, the inquiry would turn on whether constraints such as the shelter's rules or her abuser's schedule made moving during work hours the only adequate means of protecting herself and her children.[10]
ś38 The concurrence/dissent would decide as a matter of law that time off work is never necessary to prevent domestic violence. We cannot decide the jeopardy element as a matter of law here because that which is "necessary" varies with the surrounding circumstances and cannot be determined without the factual record. Our case law makes it clear that a court must evaluate the facts of a case when deciding whether an employee's actions were "necessary for the effective enforcement of the public policy." Id. In Ellis, a case in which we reviewed a grant of summary judgment, we inquired (1) whether Ellis had a reasonable belief that his refusal to disable a fire alarm was necessary to prevent violation of the public policy and (2) whether his actions were in fact necessary given the city's claim that it would never have asked him to disable a fire alarm without fire department authorization. 142 Wash.2d at 461-64, 13 P.3d 1065. This court concluded that there were "at least two fact issues as to the ["jeopardy"] prong of the Gardner test, both mandating reversal of the summary judgment." Id. at 464, 13 P.3d 1065. Similarly, in Gardner, the court stated that the "jeopardy" element required the court to ask "whether, on the facts of each particular case, the employee's discharge contravenes or jeopardizes [the] public policy." 128 Wash.2d at 941, 913 P.2d 377. The court examined the facts to determine whether the truck driver needed to leave his vehicle, including the screams and pleas for help *140 of the woman as she was chased with a knife, id. at 934, 913 P.2d 377, the position of the truck, and the fact that no one else seemed ready to help, id. at 946, 913 P.2d 377.[11] We recognized again in Korslund that the "jeopardy" element "generally involves a question of fact." 156 Wash.2d at 182, 125 P.3d 119 (citing Hubbard, 146 Wash.2d at 715, 50 P.3d 602 (citing Ellis, 142 Wash.2d at 460-63, 13 P.3d 1065)). Only the trial court is equipped to make the requisite factual inquiries to decide the "jeopardy" element. We cannot decide it in this opinion because we simply lack the factual record to do so.
ś39 The concurrence/dissent's proposed holding would also require us to overrule Gardner. The concurrence/dissent would compel Danny to show that her employer discharged her simply because she acted to prevent domestic violence and not because she took time off work to take those actions. In Gardner, this court recognized that absenteeism is protected when it is part and parcel of the public-policy-protecting actions. There, the employer argued that it discharged the armored truck driver solely because he left the truck, not because he saved a woman's life. This court explicitly rejected that reasoning, saying, "Gardner's leaving the truck cannot be analyzed in isolation: his initial act of getting out of the truck is inextricably intertwined with his motive for leaving it and his subsequent actions." 128 Wash.2d at 947, 913 P.2d 377.[12]
ś40 In this case, like in Gardner, Danny was faced with a critical situation that was not related to her employment duties. Like in Gardner, she took action in response. Like in Gardner, those actions entailed leaving work for a period of time in an effort to further a clearly established public policy. If her actions were necessary to further the public policy, as the truck driver's actions were in Gardner, her conduct is protected.[13]
ś41 In an effort to distinguish Gardner from the present case, the concurrence/dissent conflates the "jeopardy" and "absence of justification" elements. The concurrence/dissent asserts that in Gardner, this court did a special balancing of the employer's needs against the public policy in light of the fact that the public policy did not have a specific employment nexusâ a balancing that it asserts we have failed to do here. Concurrence/dissent at 144-45, 148. However, the language cited by the concurrence/dissent falls squarely in the middle of the Gardner analysis of the "absence of justification" element. See id. at 144-45; Gardner, 128 Wash.2d at 947-49, 913 P.2d 377. There, the court concluded that the employer's work rule did not provide an "overriding justification" for the discharge and thus the employee had met the fourth and last element of the tort. Gardner, 128 Wash.2d at 947-49, 913 P.2d 377. The Gardner opinion did no extraordinary analysis. It merely required the plaintiff to satisfy the "absence of justification" element, another hurdle that Danny must clear before her employer can be held liable for wrongful discharge. But the "absence of justification" element is beyond the scope of the certified question, and it also often contains factual components, see Ellis, 142 Wash.2d at 466, 13 P.3d 1065; Hubbard, 146 Wash.2d at 718, 50 P.3d 602. We cannot decide it here without a factual record, and *141 we must not do so under the guise of deciding a different element altogether.
ś42 We keep in mind that the critical inquiry in the four-part wrongful discharge test is not whether the employer's actions directly contravene public policy, but whether the employer fired the employee because the employee took necessary action to comply with public policy. See Gardner, 128 Wash.2d at 941, 913 P.2d 377. The authors of all three opinions in this case agree that Washington State has a clearly defined public policy of protecting domestic violence survivors and their families and holding abusers accountable. The tort serves to safeguard that important public policy by allowing employees to do what they must to prevent domestic violence, without fear of losing their economic independence.[14] But the concurrence/dissent's narrow reading of the jeopardy element tort would overly limit the tort's application. While it would protect employees from discharge based on their status as victims of domestic violence, it would leave exposed any employee who took an absolutely necessary morning off work to get a protection order, to give a statement to police, or to move her children out of imminent harm's way. Discouraging this conduct will directly endanger our community's efforts to end domestic violence.
ś43 Finally, we note that statistics suggest that it is in an employer's best interest to work with employees experiencing domestic violence and that such work will ultimately result in a stronger and more stable workforce. E.g., L'Nayim A. Shuman-Austin, Comment, Is Leaving Work to Obtain Safety "Good Cause" to Leave Employment?â Providing Unemployment Insurance to Victims of Domestic Violence in Washington State, 23 SEATTLE U.L.REV. 797, 821 (2000) (stating that domestic violence results in increased medical, health, and leave expenses and "dramatically affects women's workforce participation").

Conclusion
ś44 We hold that Danny has satisfied her burden of proving the clarity element of a claim for wrongful discharge in violation of public policy. Washington State has unequivocally established, through legislative, judicial, constitutional, and executive expressions, a clear mandate of public policy of protecting domestic violence survivors and their families and holding abusers accountable. Having answered the reformulated certified question in the affirmative, we return the case to the District Court.
WE CONCUR: Justice TOM CHAMBERS and BOBBE J. BRIDGE, Justice Pro Tem.
FAIRHURST, J. (concurring).
ś45 I concur with the lead opinion's determination "that Washington State has a clear public policy of protecting domestic violence survivors and their children and holding domestic violence perpetrators accountable." Lead opinion at 138. I write to express my concern about the burden placed on employers when this court recognizes new public policies and to explain, in part, my disagreement with the dissent and the concurrence/dissent.
ś46 I share the dissent's concerns regarding the burden placed on employers when this court recognizes new public policies and, thus, alters the at-will employment relationship. "[T]he wrongful discharge exception should be applied cautiously in order to avoid allowing an exception to swallow the general rule that employment is terminable at will." Sedlacek v. Hillis, 145 Wash.2d 379, 390, 36 P.3d 1014 (2001). However, in light of recent legislation explicitly providing "reasonable leave" for domestic violence victims in certain circumstances, Laws of 2008, chapter 286, section 3, any new burden imposed on employers in light of this decision is greatly reduced.
ś47 I disagree with the dissent's limitation on which sources may be considered when determining whether a clear public policy exists. In Gardner v. Loomis Armored, Inc., 128 Wash.2d 931, 933, 913 P.2d 377 (1996), we determined termination of "an at-will employee *142 who violated a company rule in order to go to the assistance of a citizen who was in danger of serious physical injury or death" violated public policy. In analyzing the clarity element of the wrongful discharge in violation of public policy claim,[1] the court relied on exceptions to constitutional protections and statutory defenses to criminal charges. Id. at 944-45, 913 P.2d 377. Neither of these sources of public policy relate directly to the employment context. Thus, I believe the dissent takes too narrow of an approach by requiring some nexus between a public policy source and the employment relationship. See dissent at 153-55. A public policy source that explicitly mentions employment is more persuasive when analyzing the clarity element of a wrongful discharge claim, but such a nexus is not imperative. In the absence of such a nexus, evidence of the public policy must be overwhelming, as it was in Gardner. In this case, because of the overwhelming number of public policy sources and unwavering commitment by the legislative and executive branches to protect domestic violence victims, I believe a clear public policy exists.
ś48 Finally, the concurrence/dissent's analysis departs from the analysis set forth in Gardner by combining the clarity and jeopardy elements of a claim for wrongful discharge in violation of public policy. Concurrence/dissent at 144-45. In Gardner, this court differentiated between the clarity and jeopardy elements. 128 Wash.2d at 941, 913 P.2d 377 ("a more consistent analysis will be obtained by first asking if any public policy exists whatsoever, and then asking whether, on the facts of each particular case, the employee's discharge contravenes or jeopardizes that public policy"). The determination of whether a clear public policy exists is a question of law and does not involve a balancing of an employer's interests in operating a business, an employee's interest in continued employment, and the public's interest in effectuating broad public policies. Id. at 937, 942-45, 913 P.2d 377 (discussing possible sources of public policy without taking into account employers' interests). As rewritten by the lead opinion, the question presented in this case involves only the clarity element, which is properly analyzed and answered by the lead opinion.
WE CONCUR: Chief Justice GERRY L. ALEXANDER.
MADSEN, J. (concurring/dissenting).
ś49 The purpose of the tort claim for wrongful discharge in violation of public policy is to protect a clearly existing public policy mandate, not create one. At all times relevant to this case, Washington law did not require private employers to grant leave to domestic violence victims for the purpose of seeking legal, medical, and social services. After this court took review, our legislature enacted legislation that expressly creates the public policy mandate the petitioners ask us to recognize as a matter of common law. See Substitute H.B. 2602, 60th Leg., Reg. Sess. § 1(1) (Wash.2008). In my view, the lead and concurring opinions improperly give retroactive effect to the new legislation, inferring a "clear mandate" of public policy from a statute that did not exist at the time this suit was instituted. Imposing tort liability based on later announced public policy defeats a central purpose of the clarity element, which is to ensure an employer has fair notice of practices that violate public policy.
ś50 The lead opinion avoids this inconvenient fact by reformulating the certified question to address only whether Washington has a clearly established public policy of preventing domestic violence, not whether public policy clearly requires employers to grant *143 leave to domestic violence victims. Yet the lead opinion implicitly imposes a broad new duty on employers to excuse any employee absenteeism resulting from domestic violence that a jury finds to have been "reasonably necessary." This represents an unprecedented expansion of the public policy tort.
ś51 We should hold that at the time Laidlaw Transit Services discharged Ramona Danny, public policy clearly prohibited an employer from discharging an employee because of his or her status as a domestic violence victim or because the employee obtained a protection order, assisted the prosecution of the perpetrator, removed children from an abusive environment, and/or accessed services for domestic violence victims. However, then-existing public policy did not forbid employers from discharging an employee due to absenteeism resulting from domestic violence, except to the extent a statutory or contractual right to protected leave applied. Discharging an employee for missing work is different from discharging an employee for the conduct she engages in while she is gone from work. Unlike the legislatures of most other states, our legislature had not yet enacted legislation requiring employers to grant leave to domestic violence victims, and it is inappropriate for this court to impose such a duty under the guise of a tort claim for wrongful discharge in violation of public policy.
ś52 This court adopted the public policy tort as a "narrow exception" to the rule that an employment contract of indefinite duration may be terminated at will by either the employer or the employee. Thompson v. St. Regis Paper Co., 102 Wash.2d 219, 233, 685 P.2d 1081 (1984). "[T]he essence of a wrongful discharge tort action is that the employer has intentionally wronged the employee." Wilmot v. Kaiser Aluminum & Chem. Corp., 118 Wash.2d 46, 74, 821 P.2d 18 (1991). Importantly, the public policy tort is an intentional tort.
ś53 The public policy tort exception to the at-will doctrine is not a vehicle by which this court may conscript employers to shoulder the burden of a societal problem. Rather, the purpose of the exception is to prevent an employer from using the power of discharge to shield itself from liability for wrongful conduct. Smith v. Bates Technical Coll., 139 Wash.2d 793, 801, 991 P.2d 1135 (2000). See generally Lawrence E. Blades, Employment at Will vs. Individual Freedom: On Limiting the Abusive Exercise of Employer Power, 67 COLUM. L.REV. 1404 (1967). The elements of a public policy tort are (1) the existence of a clear public policy (the clarity element), (2) discouraging the conduct in which the employee engaged would jeopardize the public policy (the jeopardy element), (3) the employer discharged the employee as a result of the policy-linked conduct (the causation element), and (4) no overriding justification supports the discharge (the absence of justification element). Korslund v. Dyn-Corp Tri-Cities Servs., Inc., 156 Wash.2d 168, 178, 125 P.3d 119 (2005).
ś54 The question certified by the district court is whether existing public policy clearly forbids an employer from discharging an employee because she experienced domestic violence and took leave from work "to protect herself, her family, and to hold her abuser accountable." This question implicates the first two elements: clarity and jeopardy. The lead opinion reformulates the certified question to address only clarity because it mistakenly believes jeopardy is solely a question of fact.
ś55 The threshold issue of law for a court to decide is whether a "clear mandate of public policy" forbids an employer from discharging an employee for a particular reason. Thompson, 102 Wash.2d at 232, 685 P.2d 1081. This threshold issue spans the clarity and jeopardy elements of the four-part test we adopted in Gardner v. Loomis Armored, Inc., 128 Wash.2d 931, 941, 913 P.2d 377 (1996); Hubbard v. Spokane County, 146 Wash.2d 699, 709 n. 16, 50 P.3d 602 (2002). "Clarity" involves an analysis of the clarity and importance of the public policy at issue. The clarity inquiry is simply whether "any public policy exists whatsoever," regardless of its link to the employment relationship. Gardner, 128 Wash.2d at 941, 913 P.2d 377; see also Henry H. Perritt, Jr., Employee Dismissal Law & Practice § 7.04, at 7-25 (5th ed.2007). "Jeopardy" involves an analysis of the extent to which allowing an employer *144 to dismiss an employee for a particular reason would contravene that public policy. Gardner, 128 Wash.2d at 941-42, 913 P.2d 377; Perritt, supra, § 7.06, at 7-66. Clarity is purely a question of law while jeopardy is a mixed question of law and fact.
ś56 When a statute expressly relates to the employment context, the question whether a "clear mandate of public policy" forbids discharge for a particular reason requires us to go no further than the statute itself in addressing this threshold issue. Perritt, supra, § 7.05[B], at 7-52 to -53. Examples include statutes forbidding discrimination in the workplace, providing protected leave to employees, and guaranteeing safe working conditions and fair wages. See, e.g., Roberts v. Dudley, 140 Wash.2d 58, 993 P.2d 901 (2000) (statute and preexisting case law forbid employers from engaging in sex discrimination); Smith, 139 Wash.2d 793, 991 P.2d 1135 (statutes provide grievance procedures for public employees and make it an unfair employment practice to retaliate against an employee for filing a grievance); Bravo v. Dolsen Cos., 125 Wash.2d 745, 888 P.2d 147 (1995) (statute forbids employers from interfering with employees' concerted activities); Hume v. Am. Disposal Co., 124 Wash.2d 656, 880 P.2d 988 (1994) (statute forbids employer retaliation against employees who assert right to overtime pay); Wilmot, 118 Wash.2d 46, 821 P.2d 988 (statute forbids employment discrimination against employees who file a worker's compensation claim); Bennett v. Hardy, 113 Wash.2d 912, 784 P.2d 1258 (1990) (statute defines age discrimination as an unfair employment practice).
ś57 In such instances, the legal component of the jeopardy analysis is whether the remedies provided by the legislature adequately protect the public policy. See, e.g., Korslund, 156 Wash.2d at 181, 125 P.3d 119 (concluding, as a matter of law, comprehensive statutory remedies against retaliation for reporting safety violations in nuclear industry adequately protects relevant public policy interests); compare Smith, 139 Wash.2d at 805, 991 P.2d 1135 (finding statutory remedies for wrongful discharge for filing a grievance inadequate where no recovery for emotional distress is available). However, when a statute does not directly address the employment relationship, a court must consider the clarity and jeopardy elements simultaneously, analyzing the nexus between the public policy and the workplace dispute to determine whether an important public policy would be jeopardized by permitting employee dismissals under the factual circumstances alleged. See Gardner, 128 Wash.2d at 946, 913 P.2d 377 (analyzing whether allowing employers to discharge employees for violating a work rule when necessary to save a life would contravene public policy favoring lifesaving activity).[1] The resolution of this issue defines the scope of protected conduct, and is a question of law for the court. See Henry H. Perritt, Jr., The Future of Wrongful Dismissal Claims: Where Does Employer Self Interest Lie?, 58 U. CIN. L.REV. 397, 401-02 (1989) ("Judges, not juries, decide what is public policy and what kind of jeopardy can occur if specific types of employee conduct are chilled by the threat of dismissal.... The jury decides only the actual questions of what conduct the employee engaged in and what the employer's motivation was."). Once a court decides the scope of protected conduct, it is for the jury to determine the factual issue whether the employee actually engaged in the protected conduct (the factual component of jeopardy) and whether the dismissal was motivated by the employee's protected conduct (causation). Allocating the determination of the scope of protected conduct to the court is necessary to provide appropriate notice of *145 the kind of conduct that would subject employers to liability, as allowing juries to decide, on a case by case basis, the scope of protected conduct would result in inconsistent and unpredictable outcomes. Henry H. Perritt, Jr., The Future of Wrongful Dismissal Claims: Where Does Employer Self Interest Lie?, 58 U. CIN. L.REV. 397, 401 ("The judge ought to decide the clarity and jeopardy elements, both of which involve relatively pure law and policy questions in the abstract ... [m]ost courts ... have adopted the view that the judge decides what public policy is and what kind of conduct is necessary to realize the public policy.")
ś58 In this case, no applicable statute, constitutional provision, administrative regulation, or other source of public policy cited by the lead opinion directly addresses whether, and to what extent, public policy limits a private employer's power to discharge an employee who experiences domestic violence. We have recognized a court may infer a public policy mandate from tangentially related constitutional and statutory provisions even in the absence of a direct expression of public policy. Gardner, 128 Wash.2d at 946, 913 P.2d 377.
ś59 For example, in Gardner, an armored truck company discharged an employee for violating a work rule that prohibited him from leaving the truck while his companion was making a pickup or delivery. The employee violated the rule in order to rescue a person who was fleeing from an armed bank robber. To determine whether the discharge violated a clear mandate of public policy, this court first addressed the clarity element, finding a clear public policy in favor of saving persons from life-threatening situations. This court then considered whether that public policy would be jeopardized by allowing an employer to enforce its work rule by discharging an employee under such circumstances. See Gardner, 128 Wash.2d at 948-49, 913 P.2d 377 ("This court must balance the public policies raised by Plaintiff against Loomis' legitimate interest in maintaining a safe workplace and determine whether those public policies outweigh Loomis' concerns."). After balancing the competing interests involved, this court concluded society's interest in encouraging heroic life-saving activity was paramount, requiring the employer to subordinate its own interest in strict compliance with the work rule.
ś60 As apparent in Gardner, when the source of public policy does not itself address the employment relationship, a court must balance an employer's interest in operating its business as it sees fit, an employee's interest in job security, and society's interest in the protection of public policies to decide whether a clear mandate of public policy forbids an employer from discharging an employee for a particular reason. In striking this balance, a court must act with the greatest restraint to avoid intruding on the legislative prerogative of creating public policy or unfairly subjecting employers to liability for conduct they did not know was wrongful. See Korslund, 156 Wash.2d at 180, 125 P.3d 119 (narrow construction rule applies most forcefully to the identification of a clear mandate of public policy).
ś61 "Public policy" is an amorphous concept. Virtually every statute embodies a public policy. However, for purposes of defining the scope of an employer's liability for wrongful discharge, the public policy should be "clear" in the sense that it provides specific guidance to the employer. Thompson, 102 Wash.2d at 232, 685 P.2d 1081 (emphasis omitted) (quoting Parnar v. Americana Hotels, Inc., 65 Haw. 370, 380, 652 P.2d 625 (1982)). "An employer should not be exposed to liability where a public policy standard is too general to provide any specific guidance or is so vague that it is subject to different interpretations." Birthisel v. Tri-Cities Health Servs. Corp., 188 W.Va. 371, 377, 424 S.E.2d 606 (1992). Thus, the public policy should be clear enough to put the employer on notice that discharging an employee for a particular reason would be wrongful.[2]Id. at 377, 424 S.E.2d 606 (noting *146 that an inherent aspect of the clarity of a public policy is "that the policy will provide specific guidance to a reasonable person"); Stevenson v. Superior Court, 16 Cal.4th 880, 889, 941 P.2d 1157, 66 Cal.Rptr.2d 888 (1997) ("tethering public policy to specific constitutional or statutory provisions serves ... to ensure that employers have adequate notice of the conduct that will subject them to tort liability to the employees they discharge").
ś62 We have recognized four general categories of cases that justify the imposition of tort liability: where an employer discharges an employee for (1) refusing to commit an illegal act,[3] (2) performing a public duty,[4] (3) exercising a legal right or privilege,[5] or (4) reporting an employer's illegal activity.[6] In such cases, the employee's interest in job security and society's interest in the fulfillment of public policies outweigh the employer's interest in controlling personnel decisions. We reasonably expect employers to recognize that discharging an employee for such socially undesirable reasons will expose them to liability for wrongful discharge.
ś63 In her complaint, Danny alleges her employer discharged her for "hold[ing] her abuser accountable" (complaint at 6), in violation of a clear public policy that favors "utilizing the state's legal system to obtain protection and to hold abusers accountable." Id. at 5. She further alleges her employer discharged her for "[taking] actions to protect herself [and] her family," in violation of "a clear public policy encouraging domestic violence victims to seek alternative living arrangements and social services." Id. at 6.
ś64 As discussed in the lead opinion, Washington has clearly existing public policies to prevent crimes of domestic violence, protect the victims of domestic violence, and prosecute its perpetrators. These public policies are particularly jeopardized by the chilling effect the threat of dismissal could have on employees who experience domestic violence. Domestic violence is unlike most crimes in that its victims are often reluctant to report the crime or seek help to escape the perpetrator, due to fear, shame, or economic dependence. Employers may be expected to recognize they may not penalize employees for seeking legal recourse against the perpetrators of domestic violence or for accessing social services as doing so would thwart clearly existing public policies to prevent domestic violence, protect the victims of domestic violence, and effectively prosecute its perpetrators. In view of the importance of the public policies at issue, and the employer's minimal interest in discharging a person for engaging in such conduct, I agree that public policy clearly prohibits employers from discharging an employee for obtaining a protection order, filing a complaint against an abuser, cooperating with the investigation and prosecution of the alleged abuser, finding alternative living arrangements, or accessing support services for domestic violence victims.
ś65 But nothing in the sources of public policy cited by the lead opinion would have given an employer fair notice it may not discharge an employee for absenteeism resulting from domestic violence. Thus, I would hold that while an employer could not *147 discharge an employee because he or she took such actions in response to domestic violence, before the legislature's enactment of Substitute House Bill 2602 no clear mandate of public policy prohibited an employer from discharging an employee who missed work or was unable to carry out his or her job functions as a result of domestic violence.
ś66 Discharge for absenteeism must be differentiated from discharge for the conduct underlying the absenteeism. In Wilmot, 118 Wash.2d at 75, 821 P.2d 18, this court recognized this distinction in the context of a wrongful discharge claim alleging an employer discharged an employee for filing a worker's compensation claim. In response to a certified question, we held that discharging an employee due to absenteeism resulting from a compensable injury does not, in and of itself, violate public policy absent evidence the filing of a worker's compensation claim was a significant factor in the decision.
ś67 The protected conduct in Wilmot was obtaining worker's compensation benefits. We observed that some courts define the protected conduct more expansively, to encompass an employee's absence from work due to the compensable injury. We rejected that approach, noting, "the essence of a wrongful discharge tort action is that the employer has intentionally wronged the employee." Id. at 74, 821 P.2d 18; see also Thompson, 102 Wash.2d at 232, 685 P.2d 1081 (employee must demonstrate the discharge may have been "motivated by reasons that contravene a clear mandate of public policy"). This requires proof of the employer's "illegal motive." Wilmot, 118 Wash.2d at 74, 821 P.2d 18. Although employers may not retaliate against employees for exercising their right to file a worker's compensation claim, nothing restrains employers from discharging employees because they are unable to perform their job functions as a result of a work-related injury.[7]
ś68 As in Wilmot, this court should clarify that under the law applicable to this case, an employee's protected conduct does not encompass taking time off work. Prior to the enactment of Substitute House Bill 2602, employers did not have a statutory or common law duty to grant leave to an employee for purposes of addressing domestic violence issues, except to the extent the Family Medical Leave Act of 1993 (FMLA) (29 U.S.C. § 2601) applied. Because an employer was not required to grant leave to domestic violence victims, "there should be no per se rule that a discharge for absenteeism is an illegal reason for the discharge," Wilmot, 118 Wash.2d at 74, 821 P.2d 18, when an employee took leave in order to address issues of domestic violence. Until our legislature affirmatively granted protected leave to domestic violence victims in the most recent legislative session, discharging an employee for taking such leave was not an illegal motive except to the extent it contravened an employee's right to protected leave under other applicable legislation, such as the FMLA.[8]
ś69 In limited cases, an employee's performance of a public duty may require an employer to excuse an employee's absenteeism even in the absence of any express statutory or contractual requirement. In view of the importance of the jury system, and the need for diverse representation on juries, some courts have inferred a public policy mandate against discharging employees for missing work to perform jury service. Nees v. Hocks, 272 Or. 210, 536 P.2d 512 (1975); Shaffer v. Frontrunner, Inc., 57 Ohio App.3d 18, 566 N.E.2d 193 (1990). An employer who refuses to allow an employee to miss work in order to serve on a jury places the employee in the "untenable position of choosing between his employment and [a statutorily] mandated duty." Shaffer, 566 N.E.2d at 196.
ś70 Similarly, courts have concluded public policy requires employers to excuse employees who miss work to respond to *148 compulsory process, such as a subpoena. Dunwoody v. Handskill Corp., 185 Or.App. 605, 60 P.3d 1135 (2003) (discharge for missing work to testify at murder trial violates public policy); Courts reason that allowing employers to discharge employees who miss work in order to fulfill jury duty or respond to legal summons would intolerably undermine the effective operation of our judicial system. Nees, 536 P.2d at 516. Accordingly, absent an overriding justification for the discharge, courts have determined employers may be held liable for wrongful discharge in such circumstances.
ś71 In contrast, as noted earlier, neither the parties nor my research has uncovered any case where a court has held an employer liable for wrongful discharge based on absenteeism where the employee is absent in order to report a crime, cooperate with law enforcement, or assist in the prosecution of a criminal offense. Compare Gaspar v. Peshastin Hi-Up Growers, 131 Wash.App. 630, 128 P.3d 627 (2006) (discharge in retaliation for cooperating with a police investigation violates public policy); Little v. Windermere Relocation, Inc., 301 F.3d 958 (9th Cir.2001) (discharge in retaliation for reporting being raped during a business lunch with the employer's client); Ludwick v. This Minute of Carolina, Inc., 287 S.C. 219, 337 S.E.2d 213 (1985) (discharge in retaliation for complying with a subpoena to testify at administrative hearing on alleged employer misconduct violates public policy); Wiskotoni v. Mich. Nat'l Bank-W., 716 F.2d 378 (6th Cir.1983) (discharge in retaliation for testifying before a grand jury investigating co-worker's alleged wrongdoing violates public policy).
ś72 In requiring employers to excuse any absenteeism an employee requires as a result of domestic violence, the lead opinion stretches the scope of protected conduct far beyond what this or any other court has ever recognized. Contrary to the lead opinion, Gardner does not support its result. The lead opinion finds Danny's situation comparable to Gardner's in that it involved "leaving work for a period of time in an effort to further a clearly established public policy. If her actions were necessary to further the public policy, as the truck driver's actions were in Gardner, her conduct is protected." Lead opinion at 140. The comparison between Danny and Gardner is inapt. We decided Gardner's conduct was protected because we concluded, as a matter of law, his employer had a duty to subordinate its interest in strict compliance with the work rule when necessary to save a life. Gardner did not involve absenteeism. Rather, Gardner stands for the proposition an employer can fairly be held liable for insisting on compliance with a work rule when doing so conflicts with the paramount public good of rescuing a person in mortal danger. Gardner, 128 Wash.2d at 950-51, 913 P.3d 377 (Guy, J., concurring) (stating employer's action was contrary to "human nature," as "any decent person" would choose to break a work rule in order to save a life). It certainly does not stand for the proposition that an employer has a duty to excuse any absenteeism an employee needs for the purpose of engaging in public policy-promoting conduct.
ś73 Contrary to the lead opinion, I would not "decide as a matter of law that time off work is never necessary to prevent domestic violence." Lead opinion at 139. Rather, I reject the proposition an employee's need for leave is an appropriate criterion for deciding the scope of an employer's common law duty to excuse absenteeism resulting from domestic violence. The lead opinion would decide as a matter of law that employers must excuse employee absenteeism whenever an employee needs leave to perform activities that further the general public policies of preventing domestic violence and assisting the victims of domestic violence. Moreover, the lead opinion would decide this issue sub silentio, without expressly balancing the employer's interests in operating a business efficiently with society's interests in requiring an employer to provide leave time for victims of domestic violence to take steps necessary to address the violence. Rather, the lead opinion assumes the public policy of preventing domestic violence requires employers to excuse employee absenteeism, leaving only a fact question for the jury as to whether time off from work was reasonably necessary under the circumstances. The lead opinion does not explain why employers should bear the burden of accommodating an employee's *149 needs when it has no statutory or contractual obligation to do so and otherwise lacks notice that failing to grant leave constitutes a legal wrong.
ś74 Moreover, the lead opinion offers no principled basis for limiting its holding to the needs of domestic violence victims, as opposed to the needs of crime victims generally, or, even more broadly, the needs of an employee who wishes to exercise some other right conferred by the legislature. In my view, an employer's refusal to grant leave in such circumstances does not jeopardize public policy so as to warrant the imposition of liability for wrongful discharge. To hold otherwise places an employer in the untenable position of having to guess whether a court or jury will agree the employee's absence was reasonably necessary whenever an employee misses work in order to exercise a legal right.
ś75 Whether to provide victims of domestic violence with protected leave so they may obtain protection orders, participate in criminal prosecutions, and access social services is a policy decision for the legislature. In the most recent legislative session our legislature joined the ranks of those states that have enacted legislation providing the protection the petitioners here seek. S.B. Rep. on S.B. 5900, at 2, 60th Leg., Reg. Sess. (Wash.2007) (noting 34 other states provide similar protection).
ś76 The lead opinion downplays the significance of the legislature's action, stating, "though the legislature had not yet considered such a bill at the time of Danny's discharge, the fundamental public policy underlying the bill had long been established at that time." Lead opinion at 137-38. In fact, the legislature enacted Substitute House Bill 2602 after having considered the issue in three legislative sessions. See S.B. 5900, 59th Leg., Reg. Sess. (Wash.2007) (providing employment leave for domestic violence victims); S.B. 5329, 57th Leg., Reg. Sess. (Wash.2001) (providing employment leave for all crime victims, including domestic violence victims). Apparently impatient with the legislative process, the lead and concurring opinions would accomplish by judicial fiat what properly is a matter for the policy-making branch of government. As revealed by the statutes enacted by our legislature and other states, the issue of employment leave for domestic violence victims raises a number of practical considerations best left to legislative action.
ś77 The legislature is better equipped to balance the competing interests involved and create a specific statutory framework that provides adequate notice as to the amount of protective leave, which employers are subject to the leave, whether leave must be paid or unpaid, whether the leave is in addition to or cumulative of that available under the FMLA, whether notice is required, and the nature of the activities that are protected. These are policy decisions for the legislature, not this court.
ś78 Legislatures that have addressed the issue have formulated a wide variety of responses to these questions.[9]See, e.g., California (Cal. Lab.Code §§ 230, 230.1); Colorado (Colo.Rev.Stat. § 24-34-402.7); Hawaii (Haw.Rev.Stat. § 378-72); Illinois (820 Ill. Comp. Stat. 180/1-180/45); Maine (26 Me. Rev.Stat. § 850); New York (N.Y. Penal Law § 215.14); North Carolina (N.C.GEN.STAT.95-270a).
ś79 The lead opinion finds no significance in the fact our legislature has twice considered and declined to enact legislation that would have provided the protection the petitioners seek. See Substitute S.B. 5900, at 2, 60th Leg., Reg. Sess. (Wash.2007). The lead opinion cites case law for the proposition we cannot infer legislative intent from the failure to enact legislation. However, legislative inaction is significant in the context of a public policy tort claim where the proposed legislation *150 would have established a previously unrecognized public policy. Sedlacek v. Hillis, 145 Wash.2d 379, 391-92, 36 P.3d 1014 (2001). The legislature's failure to enact the legislation would have no consequence if other sources of public policy clearly put employers on notice that discharging an employee for a particular reason is wrongful, but that is not the situation presented. Compare Roberts, 140 Wash.2d at 69 n. 9, 993 P.2d 901 (failure of proposed legislation that would have removed the small employer exemption from Washington Law Against Discrimination, chapter 49.60 RCW, "does not signify any retraction of a more fundamental public policy against wrongful discrimination in the workplace," as evidenced in preexisting statutes and case law forbidding sex discrimination in the workplace (emphasis added)). Before the legislature enacted Substitute House Bill 2602, nothing gave employers fair notice of a legal duty to excuse employee absenteeism resulting from domestic violence.

Conclusion
ś80 While purporting to decide only that Washington has established a clear public policy mandate to prevent domestic violence and prosecute its perpetrators, the lead opinion actually creates a public policy mandate requiring employers to excuse employee absenteeism related to domestic violence. I would hold public policy clearly forbids employers from discharging employees because of their status as domestic violence victims, or because they report the crime, cooperate in the criminal investigation and prosecution of the abuser, obtain a protection order, seek alternative living arrangements, or access medical or social services for domestic violence victims. However, before the legislature enacted Substitute House Bill 2602, there was no basis for inferring that public policy clearly forbids employers from discharging employees for absenteeism resulting from domestic violence.
I CONCUR: Justice CHARLES W. JOHNSON.
J.M. JOHNSON, J. (dissenting).
ś81 We have been asked to answer a single, legal question: whether a "clear mandate of public policy" establishes an exception to this state's employment law for the plaintiff. The fact that four opinions have been issuedâ and that we have decided to reformulate the question to avoid the issue entirelyâ dictates the answer that no such "clear" mandate exists.
ś82 A Washington employer generally has a common law right to terminate an employee "for no cause, good cause or even cause morally wrong without fear of liability." Thompson v. St. Regis Paper Co., 102 Wash.2d 219, 226, 685 P.2d 1081 (1984). This doctrine, the at-will employment rule, is well supported in this court's employment decisions.
ś83 Here, plaintiff's claimed tort is wrongful discharge against public policy. This is a narrow exception to the at-will rule and so must be applied in an appropriately narrow manner. Plaintiffs without remedy due to an insufficiently clear articulation of public policy must turn to the legislature.

NATURE OF THE CASE
ś84 This case involves a certified federal question from the United States District Court for the Western District of Washington, arising from a claim by a discharged at-will employee who took time off from work because of domestic abuse.
CERTIFIED QUESTION
Has the State of Washington established a clear mandate of public policy prohibiting an employer from discharging an at-will employee because she experienced domestic violence and took leave from work to take actions to protect herself, her family, and to hold her accuser accountable?

ANALYSIS
ś85 In Washington, the tort of wrongful discharge in violation of public policy is determined by a four part test: (1) a clear public policy exists, (2) discouraging the conduct in which one engaged would jeopardize the public policy, (3) the conduct caused the *151 discharge, and (4) defendant did not have an overriding justification for the discharge. Roberts v. Dudley, 140 Wash.2d 58, 64-65, 993 P.2d 901 (2000).
ś86 The certified question concerns the first element of the tort, also called the "clarity" element. An employee has a cause of action in tort for wrongful discharge only if the discharge of the employee contravenes a clear mandate of public policy. Thompson, 102 Wash.2d at 232, 685 P.2d 1081. Both parties agree that the only issue before the court is the question of law regarding the clarity element. Br. of Appellant at 6; Br. of Resp't at 6.
ś87 This court must conduct its analysis within the boundaries of the specific federal inquiry, deciding if a clear public policy currently exists and not whether a clear public policy should exist. See Warnek v. ABB Combustion Eng'g Servs., 137 Wash.2d 450, 462, 972 P.2d 453 (1999) (noting the court should consider only the issue contained within the certified question); Christensen v. Royal Sch. Dist. No. 160, 156 Wash.2d 62, 66, 124 P.3d 283 (2005) (observing that a certified federal question is answered on narrow grounds and need not address all arguments).
ś88 Here, our inquiry is not whether Washington has endorsed a general public policy against domestic violence. Or at least it was not. The lead opinion reformulates the question as: "Has the State of Washington established a clear mandate of public policy of protecting domestic violence survivors and their families and holding their abusers accountable?" Lead opinion at 130. This reformulation does no good to the parties and to the district court trying to resolve the dispute before it.
ś89 Of course Washington has a clear policy protecting domestic violence abuse victims and punishing their abusers. If that were the only question the district court had, it would not have certified the question here.
ś90 The question actually presented is much narrower: whether we have a clear policy forbidding employers from firing employees for missing work due to domestic violence. The lead opinion does not answer this question, and now the federal district court must answer. This does nothing positive for Ramona Danny, an actual victim of domestic abuse, who filed suit three years ago and must now reargue the question presented but left unanswered. Since I believe we should actually answer the question the district court asked, and should answer it in the negative, I respectfully dissent.

1. The Clarity Element in Washington

ś91 Clear public policy can be established through the "`letter or purpose of a constitutional, statutory, or regulatory provision or scheme.'" Thompson, 102 Wash.2d at 232, 685 P.2d 1081 (quoting Parnar v. Americana Hotels, Inc., 65 Haw. 370, 652 P.2d 625, 631 (1982)). A court must proceed cautiously where no prior legislative or judicial expressions are on point. See also Green v. Ralee Eng'g Co., 19 Cal.4th 66, 80, 960 P.2d 1046, 78 Cal.Rptr.2d 16 (1998) ("one of the primary reasons for requiring the public policy that gives rise to a wrongful termination action to have `a basis in either constitutional or statutory provisions,' is to limit `judicial policymaking' `lest [courts] mistake their own predilections for public policy which deserves recognition at law.'") (internal quotation marks omitted) (quoting Gantt v. Sentry Ins., 1 Cal.4th 1083, 1095, 4 Cal.Rptr.2d 874, 824 P.2d 680 (1992)).
ś92 In Washington, we are required to strictly limit exceptions to clear employment law rules. This analysis is illustrated by the decision in Roe v. Quality Transportation Services, 67 Wash.App. 604, 609, 838 P.2d 128 (1992). In Roe, the court differentiated between West Virginia's looser substantial public policy standard and Washington's more stringent clarity element. The court held that the latter is a higher standard, requiring a rigorous expression of public policy before a claim of wrongful discharge can proceed. See id. ("In West Virginia ... the employee's termination must contravene a `substantial public policy'. The standard is less rigorous than the clear mandate of public policy our courts require." (emphasis added) (quoting Twigg v. Hercules Corp., 185 W.Va. 155, 157, 406 S.E.2d 52 (1990))).
*152 ś93 In Roe the court could not find a clear expression of Washington public policy against drug testing of private employees, even though Ms. Roe cited a variety of tangentially related statutes to support her claim. Roe, 67 Wash.App. at 609, 838 P.2d 128. Despite the cited statutes' general intent to protect privacy, the court held that these related privacy protections were not sufficient to establish the exception:
None of these statutes suggest a legislative intent to announce public policy in the area of drug testing. In fact, their existence suggests to us a legislative desire to articulate public policy in the area of privacy. The Legislature has enacted many statutes specifically regulating employer-employee relationships. See RCW Title 49, "Labor Regulations". The fact that the Legislature has not enacted a statute regulating drug testing by private employers is significant. The legislative process of hearings and debates is uniquely suited to this task of defining and balancing the employee's privacy interests and employer's interests in drug testing.

Id. at 609-10, 838 P.2d 128 (emphasis added).
ś94 The above language from Roe defines our role in the present case. Here, the legislature has enacted a similar web of protections in the domestic violence arena, infra, yet none evinces a clear articulation of public policy that changes the legal relationship between employer and employees. In sum, the lead opinion's citation of tangentially related statutes, pronouncements, case law, and executive orders does not constitute clear public policy nor meet the rigorous clarity standard employed in Roe.

2. Washington At-Will Employment and the Public Policy Exception

ś95 There are only four categories of clear public policy preventing an employer from firing an employee: when the employee (1) refuses to commit an illegal act, (2) performs a public duty or obligation, (3) exercises a legal right or privilege, or (4) reports employer misconduct. See Dicomes, 113 Wash.2d at 618, 782 P.2d 1002. Danny's claim here invokes the second and third exceptions because she accessed domestic violence services and helped police to prosecute her abuser. See order at 3-4. She also asserts there is a legislatively and judicially recognized clear public policy to combat domestic violence in Washington. Br. of Appellant at 14. Absent specific public policy language, a court cannot expand the limited holdings of prior public policy exception cases to create a new exception in the present case.
ś96 Danny argues that accessing social services and moving her family were lifesaving acts, which this court has held to constitute an appropriate exception to the at-will employment rule. See Gardner, 128 Wash.2d at 943, 913 P.2d 377.[1] In Gardner this court held that firing an armored car driver who rescued a woman from a bank robbery contravened public policy. Id. at 933-35, 913 P.2d 377. The fact that the driver violated company regulations to save the life of the hostage was excused due to these clear public policy concerns. Id. at 943, 913 P.2d 377.
ś97 Gardner carved a narrow exception in the at-will employment doctrine by protecting lifesaving behavior "where a citizen's life is in imminent danger." Id. at 940, 913 P.2d 377 (emphasis added). Here, the nexus that connects Danny's potential danger from her abuser is not the same imminent danger exhibited by the hostage situation. This court has rejected the argument that broad statutory language[2] was sufficient to find an exception. Id. at 942-43, 913 P.2d 377. Gardner did not justify its conclusion based on a broad public policy of respect for human life; the exception was satisfied only by a "limited class of good samaritans who render emergency care or transportation." Id. at 943-44, 913 P.2d 377. Under Gardner, one is protected from firing only if she assists "`a citizen held hostage ... and/or who is in *153 danger of serious physical injury and/or death.'" Id. (alteration in original) (quoting certified question). Danny's case does not present the court with the split-second, lifesaving behavior like that in Gardner. Danny's efforts to secure housing and access to domestic violence services are commendable, but they do not fit within the narrow, good-samaritan exception in Gardner.
ś98 Another case, Roberts v. Dudley, demonstrates that rigorous application of the public policy exception is required even in the analogous, heavily regulated area of gender equality. 140 Wash.2d at 58, 993 P.2d 901. Roberts held that Washington had articulated a clear public policy with regard to gender discrimination by employers. Id. at 77, 993 P.2d 901 ("This clearly articulated public policy is based on RCW 49.12.200 and RCW 49.60.010 and has been previously recognized in Marquis v. City of Spokane."). Danny's claimed public policy support is very different from Roberts'. In Roberts, the court correctly relied upon a specific statute,[3] a constitutional amendment,[4] and a clear judicial precedent[5] to satisfy the clarity element of the gender discrimination exception. Id. In the current case, none of those critical elements are present.
ś99 Finally, this court correctly exercised judicial restraint in another wrongful discharge case. Sedlacek v. Hillis, 145 Wash.2d 379, 389, 36 P.3d 1014 (2001). In that decision, this court declined to find protection for an able-bodied employee through relationship to a disabled co-worker. Id. The clarity element was not satisfied because Washington had not adopted a clearly articulated discrimination policy regarding this exception. See id. at 392, 36 P.3d 1014. Moreover, the legislature had chosen not to amend the Washington Law Against Discrimination, chapter 49.60 RCW, to adopt the sought-after ADA (federal Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101-12213) protection for associates. Id. at 391, 36 P.3d 1014. The court correctly held that "the adoption of a previously unrecognized public policy under Washington law is better addressed to the Legislature." Id. at 390, 36 P.3d 1014. Here, Danny is simply asking for the adoption of an exception that had not been recognized in Washington's statutes or case law.
ś100 In sum, heavily regulated areas, such as disability protection, should be strictly interpreted by courts when the legislature has not granted a specific right. Clearly, "we cannot conclude that a clear mandate of public policy exists merely because the plaintiff can point to a potential source of public policy that addresses the relevant issue." Id. at 389, 36 P.3d 1014. Here, the legislature had not amended existing domestic violence laws to provide the sought-after employment protection.

3. Washington Statutory Authority

ś101 The lead opinion does not find one statute that expressly articulates a clear public policy exception. Rather, it assembles citations to many statutes related to domestic *154 violence, none of which articulates the claimed exception. Thus, the lead opinion can argue only by implication that statutory protection exists for victims of domestic violence in the employment context. See, e.g., lead opinion at 134.
ś102 The lead opinion cites RCW 70.123.010, which funds public housing assistance for victims of domestic abuse. Lead opinion at 133-34. This statute supports protection of domestic violence victims generally and specifically within the public housing[6] context. It does not, however, promote a clear public policy or answer the original certified question within the employment context.
ś103 Danny cites RCW 26.50.030, the Domestic Violence Prevention Act, which created the civil protective order for victims. The statute addresses domestic violence as a societal problem and is geared toward courts and professionals who frequently deal with victims of abuse. Id. (Laws of 1992, ch. 111, § 1). The statute does not provide protection for victims of abuse in the employment context.
ś104 Danny also cites RCW 10.99.010, which improves the criminal justice system's response to domestic violence. This statute deals with law enforcement personnel and the consistent enforcement of criminal penalties against all offenders. Id. The statute does not address domestic abuse in the employment context. Danny further relies on RCW 43.70.610, which notes that domestic violence is the leading cause of injury among women and is linked to numerous health problems.[7]Id. Neither of these statutes deals with employers or employee discharge.
ś105 RCW 50.20.050 is tangentially related to employment because it allows victims of domestic abuse to retain unemployment benefits if they leave work to protect themselves or families. However, the statute is concerned with benefits after leaving employment (with good cause), rather than the right of an employer to terminate employment. RCW 50.20.050. The legislature decided that retention of unemployment benefits is appropriate for an abuse victim who leaves work to protect his or her family. Id. This is the exclusive remedy provided by the legislature in the employment context.
ś106 Finally, the legislature specifically considered a bill that would have given domestic abuse victims protection in the employment context, but it failed to pass before the events here took place. See S.B. 5329, 57th Leg., Reg. Sess. (Wash.2001-02); Engrossed Substitute S.B. 5329, 57th Leg., Reg. Sess. (Wash.2001-02). Justice Owens correctly states that we cannot speculate on reasons for the nonpassage of a particular bill. Lead opinion at 134-35 n.3. While the bill is not dispositive, it is helpful to our analysis. This bill would have specifically amended chapter 7.68 RCW to provide mandated employment leave for victims of domestic abuse. Br. of Resp't at 14. Further, the bill would have given both employers and employees multiple safeguards, including administrative due process rights. See S.B. 5329, supra. Both the House[8] and Senate[9] *155 Bill Reports of S.B. 5329 note that currently there was no law on the books that provided employment leave to victims of crime, domestic or otherwise. In light of employee/employer interests at stake, we cannot expand the wrongful discharge tort through judicial decree.[10]
ś107 The legislature has acted to expressly protect certain rights of domestic violence victims. See lead opinion at 133 n.2. However, in light of the extensive protections already on the books, the absence of this exception to the at-will employment rule supports the conclusion there was not a "clear mandate of public policy."

4. Other Interpretations of Public Policy

ś108 Finally, we briefly consider Executive Order 96-05 (Domestic Violence in the Workplace) (Oct. 1, 1996). An amicus brief (filed by the Washington State Coalition Against Domestic Violence) argues that Executive Order 96-05 requires state agencies to make "every reasonable effort ... to adjust work schedules and/or grant accrued or unpaid leave to allow employees who are victim[s] of domestic violence" to obtain access to the appropriate services. Exec. Order 96-05. Executive Order 96-05 may not be treated as a source of clear public policy for those not employed by the State. Such general policy must be found in the constitution, statutes and regulatory schemes, or judicial holdings. See Thompson, 102 Wash.2d at 232, 685 P.2d 1081. The executive order would not have been required, of course, if Washington policy already established such a rule for all employees as argued here. The order applies only to state employment and further evidenced executive knowledge of an issue generally resolvable through legislation (the governor may request legislation in Washington, but did not).

CONCLUSION
ś109 We do not have a clear mandate of public policy. We should answer the certified question in the negative and return this case to the district court for further proceedings consistent with this decision.
I CONCUR: Justice RICHARD B. SANDERS.
NOTES
[1] This court may reformulate a certified question. Broad v. Mannesmann Anlagenbau AG, 196 F.3d 1075, 1076 (9th Cir.1999).
[2] Laidlaw argues that the legislature intended RCW 50.20.050 to provide the sole remedy for victims who lose their jobs as a result of domestic violence. However, "the statutory remedy, or lack thereof, does not define the policy." Roberts v. Dudley, 140 Wash.2d 58, 69 n. 10, 993 P.2d 901 (2000). Moreover, neither the plain language nor the legislative history characterizes RCW 50.20.050 as the sole remedy. More importantly, Laidlaw's argument ignores the breadth and depth of the legislature's stated commitment to encouraging Washington's domestic violence victims to escape violent situations and then aid in the prosecution of their abusers.
[3] Laidlaw argues that the extensive legislation establishing a public policy is irrelevant because the 2001 legislature failed to pass legislation that would have resulted in the protection Danny seeks. See S.B. 5329, 57th Leg., Reg. Sess. (Wash.2001). We disagree. Senate Bill 5329 would have required employers to grant as many as six weeks off to all crime victims. Id. at 3. We have no way of knowing whether the legislature would have rejected a narrower version of the statute covering only domestic violence victims who need to take limited leave from work to protect themselves or their children and hold their abusers accountable. The legislature's failure to pass a broad law covering all crime victims simply does not evince legislative intent to deny the narrower class of domestic violence victims protection from discharge in the limited situation presented in the certified question. See Our Lady of Lourdes Hosp. v. Franklin County, 120 Wash.2d 439, 453 n. 4, 842 P.2d 956 (1993) ("We refuse to speculate about the reasons for nonpassage of the bills. There are simply too many possibilities for us to reach the conclusion which DSHS has advanced."); Red Lion Broad. Co. v. Fed. Commc'ns Comm'n, 395 U.S. 367, 381 n. 11, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969) ("[U]nsuccessful attempts at legislation are not the best of guides to legislative intent.").

Laidlaw nevertheless argues that our prior case law requires us to hold the legislature's failure to pass Senate Bill 5329 dispositive. For support, Laidlaw relies on our holding in Sedlacek. In Sedlacek, we noted that the legislature failed to adopt language of a federal law on which Sedlacek relied for support of a public policy. 145 Wash.2d at 389-90, 36 P.3d 1014. We also noted, however, that the Washington Administrative Code and then-recent case law from this court had also rejected the public policy the Sedlacek plaintiffs asserted. Id. at 390, 36 P.3d 1014. Moreover, in Roberts, 140 Wash.2d 58, 993 P.2d 901, we allowed an employee to assert the common law tort of wrongful discharge even though the employee clearly lacked a statutory remedy. Id. at 69 n. 9, 993 P.2d 901 (noting the failure of bills that would have created a statutory remedy for Roberts by subjecting small employers to state antidiscrimination law).
The concurrence/dissent now refers to Substitute Senate Bill (SSB) 5900 from the most recent legislative session as an example of the legislature's "declin[ing] to enact" relevant legislation. Concurrence/dissent at 149. Far from declining to enact the legislation, the legislature unanimously passed an essentially identical bill the first time both houses voted on such a bill. The language of SSB 5900 was virtually the same as the recently passed Substitute House Bill (SHB) 2602, discussed below. Compare Substitute S.B. 5900, 60th Leg., Reg. Sess. (Wash.2008) with Laws of 2008, ch. 286. SSB 5900 passed the senate unanimously in February 2008, but the house did not vote on it before the parallel SHB 2602 passed both houses. See Bill Information, SB XXXX-XXXX-XX, http://apps.leg.wa.gov/billinfo/summary.aspx?bill=5900 (last visited September 29, 2008); Laws of 2008, ch. 286. Myriad reasons may explain why SSB 5900 did not come to a vote in either house in 2007, and its "nonpassage" says nothing about the legislature's intent with respect to the subject matter of the bill.
[4] The legislature's creation of task forces and panels to study domestic violence also demonstrates this state's dedication to preventing domestic violence through statewide partnerships to increase knowledge on domestic violence. In 1987, legislative mandates resulted in this court's creation of the gender and justice task force. In 1990, the legislature funded the Washington State Domestic Violence Task Force to study "domestic violence issues in the criminal justice systems and make recommendations for reform." WASHINGTON STATE DOMESTIC VIOLENCE TASK FORCE, FINAL REPORT 1, 13 (June 1991). In 1994, the Supreme Court established the Gender and Justice Commission to promote gender equality in our legal system. The court renewed its order in 1997 and in 2000 extended it for five years. In re Renewal of Gender & Justice Comm'n, No. 25700-B-380 (Wash. State Supreme Ct. Apr. 6, 2000). In 2000, the legislature created a domestic violence fatality review panel to study and report on domestic violence related fatalities. RCW 43.235.020.
[5] According to national statistics, violence against women costs companies ¤727.8 million each year due to lost productivity. Nat'l Ctr. for Injury Prevention & Control, Ctrs. for Disease Control & Prevention, Dep't of Health & Human Servs., Costs of Intimate Partner Violence Against Women in the United States 31 (Mar.2003).
[6] Amicus curiae Washington Employment Lawyers Association contends that Washington has a "public policy favoring a full realization of equal employment opportunities for women." Wash. Employment Lawyers Ass'n Br. at 17. It contends that the majority of domestic violence victims are women and that terminating Danny under the circumstances presented in the certified question would frustrate the policy of providing equal opportunities for women. Although we find this argument engaging, we need not reach it to answer the certified question.
[7] Laidlaw argues that the executive order does not apply to private employers. Laidlaw's argument urges an unprecedented narrow approach to the clarity element.
[8] Note that newly passed SHB 2602 provides a civil cause of action against employers who discharge employees for taking "reasonable" time off in response to domestic violence. Laws of 2008, ch. 286, § 12. The tort of wrongful discharge provides narrower protections for employees than does the new legislation.
[9] As noted above, Laidlaw argues that some employees might make false claims of domestic violence. The validity of an employee's claim of domestic violence is generally established through the actions the employee must take. For example, a person normally will not seek a protection order or move her or his children to a shelter unless the threat of domestic violence is real. Employers are free to require documentation that employees are actually taking the actions for which they request time off.
[10] Again, the factual circumstances would determine the amount of time off necessary. We stress, however, that time off would be necessary only to protect herself and her children from actual domestic violence. She would be entitled to time off to move her children directly from harm's way, but not to run errands or generally reorder her life.
[11] The concurrence/dissent rejects "the proposition an employee's need for leave is an appropriate criterion for deciding the scope of" protected activity. Concurrence/dissent at 148. But the Gardner jeopardy analysis demonstrates that whether the employee's act of leaving work is factually "necessary" to protect the public policy is the very heart of the jeopardy inquiry.
[12] Likewise, in the "jury duty" and "subpoena" cases cited by the concurrence/dissent, the employees were discharged because responding to these public duties required time off work, not because their employers disliked the actions of serving on a jury or testifying in court.
[13] Wilmot v. Kaiser Aluminum & Chemical Corp., 118 Wash.2d 46, 821 P.2d 18 (1991), does not compel a contrary conclusion. There, we held, under the "absence of justification" element, that it was possible for an employer to use absenteeism as a legitimate justification for discharging an employee who had filed a workers' compensation claim. Id. at 75, 821 P.2d 18. However, the plaintiff there did not suggest that time off work was necessary to protect the right to file workers' compensation claims, the public policy in question. In contrast, Danny's time off work may have been necessary to protect her and her children from domestic violence. The Wilmot opinion's commentary on absenteeism is inapposite.
[14] As noted above, the tort's comprehensive four-part structure and its assignment of the burden of persuasion to the plaintiff serve to protect employers from unnecessary liability.
[1] To prevail on a claim for wrongful discharge in violation of public policy, the following four elements must be established:

"(1) The plaintiffs must prove the existence of a clear [mandate of] public policy (the clarity element).
(2) The plaintiffs must prove that discouraging the conduct in which [the employee] engaged would jeopardize the public policy (the jeopardy element).
(3) The plaintiffs must prove that the public-policy-linked conduct caused the dismissal (the causation element).
(4) The defendant must not be able to offer an overriding justification for the dismissal (the absence of justification element)."
Sedlacek, 145 Wash.2d at 387, 36 P.3d 1014 (alterations in original) (quoting Gardner, 128 Wash.2d at 941, 913 P.2d 377).
[1] In Gardner, the majority inferred a "fundamental" public policy in favor of saving persons from life threatening situations from the emergency exception to the warrant requirement, recognition of self-defense as a defense to homicide, and the necessity defense to all other criminal charges. Specialists in the field point to Gardner as an anomaly in that the sources of law relied upon for the public policy impose no duty on either the employer or the employee to engage in, or refrain from, the conduct at issue. See, e.g., Deborah A. Ballam, Employment-at-Will: The Impending Death of a Doctrine, 37 AM. BUS. L.J. 653, 671-72 (2000) (observing that the Gardner decision represents a "dramatic change in the existing precedent defining public policy for purposes of the wrongful discharge tort" and suggesting that it is "an anomaly based on unusual circumstances").
[2] Perritt analogizes the "clear mandate" requirement to the "duty" element of a negligence case, both of which describe the defendant's legal obligation to the plaintiff. See Perritt, supra, § 7.05 n.100. In addressing only whether there is a public policy to prevent domestic violence, this court has only partially answered the critical threshold question of the employer's responsibilities in relation to the public policy at issue.
[3] Hubbard, 146 Wash.2d 699, 50 P.3d 602 (insisting on compliance with county zoning and building codes); Ellis v. City of Seattle, 142 Wash.2d 450, 13 P.3d 1065 (2000) (refusal to violate a fire code); Thompson, 102 Wash.2d 219, 685 P.2d 1081 (compliance with federal antibribery statute).
[4] Gardner, 128 Wash.2d 931, 913 P.2d 377 (lifesaving activity); Gaspar v. Peshastin Hi-Up Growers, 131 Wash.App. 630, 128 P.3d 627 (2006) (cooperation with a police investigation of illegal activity by co-worker).
[5] Smith, 139 Wash.2d 793, 991 P.2d 1135 (exercising right to file a grievance against an employer); Roberts, 140 Wash.2d 58, 993 P.2d 901 (opposition to sex discrimination); Bravo, 125 Wash.2d 745, 888 P.2d 147 (exercising statutory right to engage in concerted organizing activities); Hume, 124 Wash.2d 656, 880 P.2d 988 (asserting statutory right to overtime pay); Wilmot, 118 Wash.2d 46, 821 P.2d 18 (filing a worker's compensation claim).
[6] Korslund, 156 Wash.2d 168, 125 P.3d 119 (reporting alleged violation of federal hazardous waste regulations); Bennett, 113 Wash.2d 912, 784 P.2d 1258 (opposition to age discrimination practices); Dicomes v. State, 113 Wash.2d 612, 782 P.2d 1002 (1989) (governmental misconduct).
[7] Wilmot was decided before the enactment of the Family Medical Leave Act of 1993, 29 U.S.C. §§ 2601, 2612(a)(1)(D), which requires employers to grant up to 12 weeks of leave per year when a qualified employee is unable to work due to a medical condition.
[8] Of course, if an employer asserts the discharge was the result of absenteeism rather than retaliation for accessing legal or social services to remedy the domestic violence, an employee may demonstrate the proffered motive is pretextual.
[9] Substitute House Bill 2602 enacted by our legislature provides relatively expansive protection for domestic violence victims. It contains no small employer exemption, entitles employees who experience domestic violence to take "reasonable leave" to seek legal, medical, and social services, with appropriate notice to employers, requires employers to restore employees to their original position, with no loss of benefits, prohibits employers from taking any adverse employment actions against employees who exercise their statutory privileges, and provides remedies for violations.
[1] Gardner's reasoning is particularly germane because it involved a certified question from the United States District Court for the Eastern District of Washington regarding a "clear public policy." Id. at 935, 913 P.2d 377.
[2] See, e.g., RCW 7.69.010, RCW 9.01.055, RCW 9A.76.020, .030.
[3] There is no specific statutory authority in effect when the actions here took place that Danny can cite for an employment remedy in the domestic violence arena. Instead, Danny cites a litany of general domestic violence statutes, none of which articulates clear policy in the all-important employment context. Contrast this with Roberts, where RCW 49.12.200 is clearly titled "Women may pursue any calling open to men." Roberts, 140 Wash.2d at 67, 993 P.2d 901 (boldface omitted). This clear articulation of public policy against sexual discrimination in the employment context is unlike Ms. Danny's attempt to extrapolate unrelated domestic violence statutes, infra.
[4] In his concurring opinion, Chief Justice Alexander found that Washington's Equal Rights Amendment, Wash. Const. art. XXXI (amend.61), also embodied a "powerful source of public policy." Roberts, 140 Wash.2d at 77, 993 P.2d 901 (Alexander, J., concurring). There is no similar constitutional provision in Washington that specifically protects victims of domestic violence from adverse employment actions. The victims rights amendment applies to the victims' rights against their assailants, not third party employers.
[5] Robert's reliance on clearly applicable language from Marquis v. City of Spokane, 130 Wash.2d 97, 922 P.2d 43 (1996) is different from Danny's reliance on sparsely analogous cases. Marquis clearly stood for "[t]his state's strong policy against sex discrimination." Id. at 109, 922 P.2d 43. The employer in Roberts refused to rehire the employee because she was pregnant, which resulted in direct gender discrimination.
[6] Danny also cites RCW 59.18.570 and 59.18.580 to support her position. The statutes, which are part of the Washington Residential Landlord-Tenant Act, chapter 59.18 RCW, prohibit housing discrimination against victims of domestic abuse. They also allow victims to terminate leases early, without penalty, if necessary for safety reasons. However, there is no mention of the employer/employee relationship within the statutes.
[7] Danny argues that employment protection should be extrapolated from the long list of statutes where the legislature has conferred certain protections and benefits to victims of domestic abuse. These include: RCW 40.24.030 (address confidentiality program); RCW 4.24.130(5) (name of domestic violence victim can be sealed); RCW 26.09.191, RCW 26.09.050(1), RCW 26.10.040(1)(d), RCW 26.26.130(9), RCW 26.50.060(1)(b) (protects children from contact with violent parents); RCW 10.99.090 (officer-involved domestic violence); and Laws of 2006, ch. 259, §§ 1, 2(8), 5(1)(c) (protecting communication between victims and their advocates). Detrimental to Danny's assertion, none of the preceding statutes mention the employee or employment relationship as it pertains to a victim of domestic abuse.
[8] "Neither federal law nor Washington Law specifically require an employer to allow a crime victim to take leave from work to obtain medical, legal, or other services." House Comm. on Commerce & Labor, H.B. Rep. on Engrossed Substitute S.B. 5329 (Feb. 20, 2002).
[9] "Neither the crime victim compensation law nor the state's labor standards related to leave, provide for a grant of leave from work for crime victims." Senate Comm. on Commerce, Labor & Financial Institutions, S.B. Rep. on Engrossed Substitute S.B. 5329 (Feb. 19, 2002).
[10] Surely, this certified question is not the appropriate arena for broadening the exception. The lead opinion tacitly acknowledged the wide-ranging implication of its own argument when it limited its own holding. Lead opinion at 137-38. We must take seriously Gardner's admonition to narrowly construe the exception and thereby "guard against frivolous lawsuits." 128 Wash.2d at 936, 913 P.2d 377.